VERMONT SUPREME COURT



Case Nos. 25-AP-413,
25-AP-414,
25-AP-415 &
25-AP-416

109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JULY TERM,   2026

| | |
|---|---|
| Jessica Cover v. Susan Tyrell\* | } APPEALED FROM: |
| Jessica Cover v. Robert Nolan\* | } Superior Court, Orleans Unit, Civil Division |
| Christopher Cover v. Susan Tyrell\* | } CASE NOS. 25-ST-00839; 25-ST-00840; |
| Christopher Cover v. Robert Nolan\* | }       25-ST-00841 & 25-ST-00842 |
| | Trial Judge: Lisa Warren |

In the above-entitled cause, the Clerk will enter:

Defendants Robert Nolan and Susan Tyrell appeal from final anti-stalking orders issued against them in four consolidated cases filed by plaintiffs Christopher and Jessica Cover. We affirm.

## I. Background

In August 2025, each plaintiff filed complaints seeking anti-stalking orders against both defendants. The trial court held an evidentiary hearing on all four matters over two days in September and October 2025. Plaintiffs were present with counsel and defendants were self-represented. In November 2025, the court issued a written decision including the following findings.

The parties own abutting vacation cottages in a remote area of Brownington, Vermont. There are no other nearby neighbors. Plaintiffs live elsewhere in the state and spend time at their cottage on weekends and during vacations. Defendants' primary residence is in Florida. They use their cottage—which Ms. Tyrell has owned since the 1990s—to vacation and rent out.

When plaintiffs first purchased their cottage, they enjoyed a pleasant, neighborly relationship with defendants. After several months, this relationship began to erode. Defendants sought to involve plaintiffs in their ongoing legal action against the individual who sold plaintiffs their cottage, but plaintiffs did not wish to participate. Defendants also pressured plaintiffs to remove a fence between their properties, change an easement, and sell defendants a portion of their land. Plaintiffs declined to do so because they wanted to understand the underlying issues better before making a decision. Defendants responded to plaintiffs' refusal to acquiesce to their

various requests with "an unambiguous campaign of retaliatory harassment." When things began "getting nasty," plaintiffs retracted their initial offer to let defendants use a garden on their property and erected a fence in the garden. There was also a conflict about some changes plaintiffs made to a rock garden to accommodate their property. The relationship took a turn for the worse sometime after the beginning of September 2022. Defendants indicated that they "would not move forward peacefully."

When plaintiffs first purchased their property, defendants had cameras on their cottage that surveilled only their own land. Over time, the camera angles changed such that they began detecting movement on various portions of plaintiffs' property, activating a voice on the alarm system that announced: "You are being recorded." Ms. Cover once triggered this alarm by walking out of her front door to her clothesline. In addition, six "ear-piercing" alarms sounded when plaintiffs walked on one section of their own property, and there were flashing lights in the same area. Plaintiffs had to pass loud alarms on defendants' property to get to the back part of their own property to play lawn games. All of this made Ms. Cover extremely uncomfortable. When Mr. Cover—a member of the National Guard—was away on deployment, Ms. Cover was nervous and fearful.

The security system defendants installed eventually included, at a minimum, cameras, motion-sensing alarms, seismic sensors, and drone surveillance. Although defendants used this system for standard home-security concerns, they also employed it as a means to continuously monitor plaintiffs' activities. Defendants noted plaintiffs' movements in "disconcerting detail." On one occasion, Mr. Nolan sent Mr. Cover a text message remarking that he had been "flying his government drone" and observed that five bears set off seismic sensors in the area where Ms. Cover liked to walk and that she set off these alarms as well. Mr. Nolan later contacted Mr. Cover to tell him that the "magnetic and seismic functions [of] the ground sensors [were] going crazy" and thanked Mr. Cover for planting trees. This exchange highlighted that, even when defendants were not present at their cottage, they continued to monitor plaintiffs' activities.

Mr. Nolan sent Mr. Cover multiple text messages that plaintiffs found intimidating. These messages—which Mr. Nolan would later claim had been intended for other recipients— included statements that he would "send over my military records that can be verified that I am certified as a sniper by the USA" and that he wished to "increase my Leupold scope to the farthest magnification with a built[-]in recoil vibration reduction." In another message, Mr. Nolan sent a picture of a dead squirrel. He asserted that he had shot it from 148 feet away at a thirty-two-foot elevation and stated: "this is what I am talking about, very humane way (instantaneous death). Take off the very top of the skull cap so the internal body pressure will pop the brain out, thus severing the brain stem." The court did not credit Mr. Nolan's explanation that these "intimidating, even gory" messages were sent to Mr. Cover by accident. It found that they were part of a broader attempt by both defendants to intimidate plaintiffs and deter them from visiting their Brownington property.

Mr. Nolan engaged in target practice when at his property, aiming in the direction of plaintiffs' property in an area where Ms. Cover often walked her dog. He warned plaintiffs that—even on their own property—they could be within his "line of fire." The court found that this was not a good-faith statement, but instead a threat or warning that plaintiffs should stay off their own property. As a result of this conduct, plaintiffs placed "safety zone" signs on their property. The signs were all removed and turned around without plaintiffs' permission. This interference with the signs on plaintiffs' property demonstrated that defendants were unwilling to honor plaintiffs' request that their property be a "safety zone."

2

At one point, Mr. Nolan advised plaintiffs that his close friend—a "marksman/sniper"—was going to defendants' property to "decompress" after being in a "hotspot." Mr. Nolan warned plaintiffs that his friend would have weapons and urged them to "try not to surprise him[,] especially at night." The clear implication of this statement was that if plaintiffs were to disturb Mr. Nolan's friend, even inadvertently and while on their own property, they risked being shot.

Mr. Nolan also continued to discuss the ongoing litigation, describing how much defendants had paid their attorneys and warning that they would do it again if necessary. Ms. Tyrell joined in the communications, at one point telling Ms. Cover that her actions had "crossed a line" and "now dragged your husband and yourself into the litigation." Defendants threatened to sue plaintiffs multiple times. Mr. Nolan messaged plaintiffs that the issue would "only continue to escalate and the day to day living conditions/quality in Vermont WILL assuredly at the very least not be pleasant."

In the fall of 2023, Mr. Nolan told plaintiffs that defendants were purchasing a robot for security. He explained that the robot would mow the lawn and plow snow and could connect to defendants by video and audio immediately and call 911 if needed. Plaintiffs discovered the robot on their right-of-way several times, although they had not given defendants permission for the robot to use it. Plaintiffs installed a piece of fence next to their cottage for privacy and, shortly thereafter, the robot entered the right-of-way and moved such that it could "see" around the fence. The robot did this a few times.

Plaintiffs began parking in a different location so their vehicle would not be surveilled when they went to their cottage. They made a trail that avoided the cameras and alerts and used it to hike to their property. In June 2024, defendants installed sensors on the gate to the common-access road on plaintiffs' property without plaintiffs' permission. The sensors alerted defendants each time plaintiffs entered or exited their own property.

Plaintiffs placed stakes along the right-of-way in their land because they planted new grass and installed a new mound system. Ms. Tyrell removed the stakes without plaintiffs' permission and yelled at Ms. Cover that the stakes could not be there. This willingness to enter plaintiffs' property without permission contributed to plaintiffs' fear. Workers acting on behalf of defendants also moved logs and stones on plaintiffs' property without plaintiffs' permission.

Plaintiffs did not discuss the alarm and camera issues with defendants based on the parties' prior interactions and defendants' escalating behaviors. They began locking their cottage door. Ms. Cover became unable to sleep at night while at the cottage due to defendants' actions. She worried that Mr. Nolan might enter their cottage. Hearing announcements that "you are being watched" increased both plaintiffs' anxiety. They both felt threatened by defendants and entertained the idea of selling the cottage as they were no longer sure that they wanted to spend their retirement there.

For the reasons detailed below, the trial court concluded that both defendants had stalked both plaintiffs and issued the four requested final anti-stalking orders. The orders applied for a two-year period and, among other things, required defendants to stay away from plaintiffs, refrain from firing any firearm, pellet gun, or BB gun onto plaintiffs' property, and ensure that any surveillance equipment did not capture movement on plaintiffs' property.

Defendants, now represented by counsel, appeal to this Court.

## II. Analysis

The trial court must grant a civil complaint for a final anti-stalking order if it "finds by a preponderance of the evidence that the defendant has stalked . . . the plaintiff." 12 V.S.A. § 5133(d). For purposes of the statute, " '[s]talk' means to engage purposefully in a course of conduct directed at a specific person that the person engaging in the conduct knows or should know would cause a reasonable person to" either "fear for the person's safety or the safety of a family member" or "suffer substantial emotional distress." Id. § 5131(6). As relevant here, a "course of conduct" is defined as "two or more acts over a period of time, however short, in which a person follows, monitors, surveils, threatens, or makes threats about another person, or interferes with another person's property." Id. § 5131(1)(A)(i). The definition applies "to acts conducted by the person directly or indirectly, and by any action, method, device, or means." Id. § 5131(1)(B).

On appeal, defendants challenge the trial court's factual findings and contend that, for several reasons, it erred in concluding that they engaged in conduct satisfying the statutory definition of stalking. Whether the trial court correctly interpreted the anti-stalking statute is a question of law that we consider anew on appeal. Morton v. Young, 2023 VT 29, ¶ 10, 218 Vt. 96. On the other hand, because the trial court "is in a unique position to assess the credibility of witnesses and weigh the strength of evidence at hearing," we review its decision to grant or deny a final anti-stalking order "only for an abuse of discretion." Scheffler v. Harrington, 2020 VT 93, ¶ 8, 213 Vt. 364 (quotations omitted). Thus, we will not disturb the trial court's factual findings if supported by the evidence and—provided the court correctly applied the law—we will uphold its conclusions where they are supported by its findings. Haupt v. Langlois, 2024 VT 3, ¶ 9, 218 Vt. 605.

At the outset, we note that defendants have waived all of their challenges to the court's factual findings by failing to order transcripts of both days of the evidentiary hearing. See V.R.A.P. 10(b) (providing that appellant bears responsibility to order transcripts necessary for appeal and that, "[b]y failing to order a transcript, the appellant waives the right to raise any issue for which a transcript is necessary for informed appellate review"). Although defendants ordered the transcript of the October 2025 hearing, they did not order the transcript of the September 2025 hearing. Because the court's findings were based on evidence taken over the course of both hearings, the September hearing transcript is indispensable to an informed appellate review of any challenge to the court's findings. See Swett v. Gates, 2023 VT 26, ¶ 20, 218 Vt. 76 (explaining that on appeal from anti-stalking order, factual finding will be disturbed only if appellant "show[s] there is no credible evidence to support the finding").[1] We therefore turn to defendant's arguments regarding the court's legal conclusions.

Defendants contend that the court erred in holding both of them responsible for the activities underlying its conclusion that they stalked plaintiffs. In its decision, the court indicated that many of the actions at issue were attributable to defendants jointly. For instance, it noted that while Mr. Nolan may have been "responsible for the lion's share of the acquisition and installation of the specific surveillance systems, Ms. Tyrell is, at least, a willing participant in the effort to surveil the Covers themselves and the Covers' property." The court observed that, in

---

[1] The court's factual findings reflected its assessment crediting plaintiff's testimony and discrediting defendant's. Given the court's unique position we would be unlikely to disturb findings based on these assessments even if both transcripts had been ordered.

4

one "particularly confrontational message," Mr. Nolan told Mr. Cover: "I will speak for [Ms. Tyrell], she will agree to the tone / intentions in this text as well." The court reasoned that Ms. Tyrell was involved in the relevant acts "either 'directly or indirectly' as contemplated by" the statute.[2] 12 V.S.A. § 5131(1)(B). The court's conclusions as to the attribution of the conduct at issue are amply supported by its findings. As a result, we will not disturb them on appeal. Haupt, 2024 VT 3, ¶ 9.

Defendants next contend that that the trial court's findings were insufficiently specific to support its conclusion that the required elements were met. "Extensive findings are not generally required" in civil anti-stalking proceedings, "which are aimed at providing relief to the putative victim rather than punishing the alleged perpetrator." Smith v. Wright, 2013 VT 68, ¶ 16, 194 Vt. 326 (articulating this principle with respect to relief-from-abuse (RFA) proceedings); see Haupt, 2024 VT 3, ¶¶ 19-21 (explaining that anti-stalking and RFA statutes are both remedial provisions "solely focused on the plaintiff's need for immediate and prospective protection from the defendant rather than the defendant's liability" and recognizing that logic of cases under one statute therefore often applies in cases arising under other (quotation omitted)). In this case, however, the trial court made extensive findings in its nine-page written order; these findings are both specific and detailed in nature. As set forth below, defendants' arguments rest on mischaracterizations of these findings.

Contrary to defendants' assertion, the trial court identified the conduct that constituted interference with property, surveillance, and threats. See 12 V.S.A. § 5131(1)(A)(i). The court concluded that defendants interfered with plaintiffs' property by entering their property and altering their safety signage. The court found that defendants engaged in surveillance of plaintiffs in multiple ways, including through the use of seismic sensors, drone footage, motion detectors, and the use of their yard robot to "look around" plaintiffs' fence—demonstrating that defendants engaged in a course of conduct in which they monitored and surveilled plaintiffs. It also concluded that both defendants made multiple threats against plaintiffs, including by stating that things would not be peaceful going forward, warning that Ms. Cover was in Mr. Nolan's line of fire during target practice, and sending the messages involving the decapitated squirrel and Mr. Nolan's firearm purchase. And while defendants assert that the trial court failed to apply the requisite objective standard and instead assessed only how plaintiffs responded to these actions, the court expressly concluded that this conduct "would cause a reasonable person in the Covers' position to both fear for their safety and to experience substantial emotional distress." See 12 V.S.A. § 5131(6). It did not misapply the statutory standard.

---

[2] Defendants also assert that, as used in the statute, "directly or indirectly" refers to "the manner in which a defendant may engage in conduct, such as through devices or other means, rather than the attribution of conduct from one individual to another." We do not address this argument as it was raised for the first time in defendants' reply brief. See Vasseur v. State, 2021 VT 53, ¶ 15, 215 Vt. 224 ("Our law is clear that issues not raised in an appellant's original brief may not be raised for the first time in a reply brief." (quotation omitted)). We note, however, that it is entirely at odds with the plain language of the statute, which provides that the definition of "course of conduct" "shall apply to acts conducted by the person directly or indirectly, and by any action, method, device, or means." 12 V.S.A. § 5131(1)(B) (emphases added); see Hinkson v. Stevens, 2020 VT 69, ¶ 31 (providing that where civil anti-stalking statute is unambiguous, we give effect to its plain language). Thus, even if we were to reach defendants' argument concerning the court's application of the statute, we would not conclude that they have demonstrated error.

Defendants also argue that they acted lawfully in installing security systems on their property, and that the court erred in concluding that these measures were "aimed at" plaintiffs or "undertaken with a purpose to threaten, surveil, or harass." They argue that this case is similar to Haupt v. Langlois, 2024 VT 3. Defendants assert that, in Haupt, we "held that lawful conduct, specifically placing metal stakes near a property boundary, did not satisfy the statutory elements of stalking because it was not objectively threatening." Nothing in Haupt supports this representation. In that case, we neither reached such a conclusion nor considered any issue related to the placement of boundary stakes—we merely noted, in reciting the procedural history leading to the defendant's appeal from an anti-stalking order, that the trial court rejected the plaintiff's claim that the placement of such stakes constituted a threat.[3] Haupt, 2024 VT 3, ¶ 7. Moreover, the trial court expressly concluded that—although defendants used their extensive surveillance systems for security purposes—they also used them to monitor plaintiffs. Hinkson v. Stevens, 2020 VT 69, ¶¶ 38-40, 213 Vt. 32 ("Monitoring . . . involves tracking or collecting some form of information about the person being monitored or their activities."). Defendants have not identified any error in this analysis.

Finally, defendants suggest that the trial court erred in relying on communications between the parties because these communications represented constitutionally protected speech. To be sure, the statute excludes constitutionally protected activity from the definition of "course of conduct." 12 V.S.A. § 5131(1)(B). But the First Amendment does not protect "true threats," which "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Hinkson, 2020 VT 69, ¶ 44 (quotation omitted). Under the statute, such threat need not be "express or overt." 12 V.S.A. § 5131(1)(C). Again, the court's findings regarding the intent underlying the communications at issue support its conclusion that they constituted prohibited conduct under the anti-stalking statute. Haupt, 2024 VT 3, ¶ 9.

We have considered all arguments discernible in defendants' brief and conclude that they have not identified a basis to disturb the trial court's final anti-stalking orders.

---

[3] After defendants filed their initial brief, they moved for permission to amend it by removing and replacing a citation. In an order granting permission, the Court observed that the removed citation did not correspond to any identifiable case. A party's citation to fake authority to support an argument on appeal materially undermines the force of the argument, not to mention the credibility of the person submitting the brief. The Court's order granting permission to amend also reminded counsel for defendants that, in presenting a document to the Court, he is certifying that "to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the "legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." V.R.C.P. 11(b)(2); see V.R.A.P. 25(d)(2) ("By presenting a document to the Court—whether by signing, filing, submitting, or later advocating it—an attorney or self-represented party is making the certification provided by V.R.C.P. 11(b) as to that paper."). The amended brief nonetheless inaccurately describes our holding in Haupt. It also purports to quote from Haupt with a phrase that does not appear in the opinion. We now again warn counsel for defendants that further conduct of this nature may result in sanctions proceedings. See V.R.A.P. 25(d)(3) ("If after notice and a reasonable opportunity to respond, the Court determines that V.R.C.P. 11(b) has been violated, the Court may, subject to V.R.C.P. 11(c), impose an appropriate sanction on those violating the rule or responsible for the violation.").

<u>Affirmed</u>.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Michael P. Drescher, Associate Justice